613 So.2d 415 (1992)
STATE of Florida, et al., Appellants,
v.
FLORIDA POLICE BENEVOLENT ASSOCIATION, INC., et al., Appellees.
No. 77842.
Supreme Court of Florida.
December 24, 1992.
Rehearing Denied March 4, 1993.
*416 Robert A. Butterworth, Atty. Gen., and Brian S. Duffy and Kimberly J. Tucker, Asst. Attys. Gen., Tallahassee, for appellants.
Gene "Hal" Johnson and Donald D. Slesnick II, Tallahassee, for appellees.
GRIMES, Justice.
We have for review State v. Florida Police Benevolent Association, 580 So.2d 619 (Fla. 1st DCA 1991), which declared a proviso in a state appropriations bill unconstitutional. We have jurisdiction under article V, section 3(b)(1) of the Florida Constitution.
Pursuant to chapter 447 of the Florida Statutes (1987), the governor entered into collective bargaining agreements with several unions. The agreements were to be effective between July 1, 1987, and June 30, 1990. These agreements incorporated by reference the then-existing provisions of section 22A-8 of the Florida Administrative Code, which governs attendance and leave of career service employees. Under this section, employees were entitled to 17.333 hours per month of annual leave and four hours and twenty minutes per month of sick leave. If an employee accumulated more than 240 hours of annual leave in a year, the employee had the option of converting the excess hours into sick leave or receiving a cash payment for one-half of the excess hours. Finally, the rules provided that sick leave could only be used when the employee's illness was verified in writing by a physician.
In 1988, the legislature enacted its general appropriations act. Ch. 88-555, Laws of Fla. Section 9.3.A(5) of the act contained proviso language that altered the leave policy for career service employees, and thus the leave awards for which the unions had bargained. Under the proviso, annual leave was decreased from 17.333 hours per month to thirteen hours per month. Sick leave was increased from four hours and twenty minutes per month to eight hours per month. All accumulated annual leave in excess of 240 hours was cancelled, thus eliminating the cash-payment and sickleave conversion options. Finally, the requirement of obtaining a written verification of illness for employees claiming sick leave was eliminated. This last measure apparently was aimed at preventing employees from being paid for time off necessary to visit the doctor to obtain the written verification.
The unions contend that the legislature's actions abridged their right to collectively bargain, which is guaranteed by the Florida Constitution. Both the trial court and the district court of appeal agreed. The trial court granted summary judgment in favor of the unions, and the district court of appeal affirmed the judgment, finding section 9.3.A(5) of the Appropriations Act to be invalid under article I, section 6.
In addressing this issue, we begin by examining the extent of the right of public employees to collectively bargain. In Dade County Classroom Teachers' Association v. Ryan, 225 So.2d 903, 905 (Fla. 1969), this *417 Court construed article I, section 6[1] to include public employees. Three years later we threatened to impose judicial guidelines if the legislature failed to pass legislation implementing the right of public employees to engage in collective bargaining. Dade County Classroom Teachers Ass'n v. Legislature, 269 So.2d 684 (Fla. 1972). Thereafter, the legislature enacted Part II of Chapter 447 pertaining to public employees.
While this Court has been vigilant in upholding the right of public employees to collectively bargain, we have also recognized that public employee bargaining is not the same as private bargaining. Thus, in United Teachers of Dade v. Dade County School Board, 500 So.2d 508, 512 (Fla. 1986), we stated:
Our holding in Ryan that "public employees have the same rights of collective bargaining as are granted private employees," 225 So.2d at 905, did not, however, mean that there exists no differences between public and private employee bargaining. Indeed, we recognized as much in City of Tallahassee [v. Public Employee Relations Comm'n, 410 So.2d 487 (Fla. 1981)] by stating that "[i]t would be impractical to require that collective bargaining procedures ... be identical in the public and the private sectors." 410 So.2d at 491. Myriad distinctions, not just those of procedures, exist between public and private collective bargaining, and have been noted by the highest courts of several sister states. See, e.g., West Hartford Education Association, Inc. v. DeCourcy, 162 Conn. 566, 295 A.2d 526 (1972) (private sector view of wages, hours, and terms and conditions of employment is not easily superimposed on the field of education); Spokane Education Association v. Barnes, 83 Wash.2d 366, 517 P.2d 1362 (1974) (area of management control in private sector different than the duty imposed on those who manage schools). We find wise the counsel of Justice Nix, speaking for the Supreme Court of Pennsylvania:
[W]e are not suggesting that the experience gained in the private sector is of no value here, rather we are stressing that analogies have limited application and the experiences gained in the private employment sector will not necessarily provide an infallible basis for a monolithic model for public employment.

Pennsylvania Labor Relations Board v. State College Area School District, 461 Pa. 494, 500, 337 A.2d 262, 264-265 (Pa. 1975).
See also City of Tallahassee v. Public Employee Relations Comm'n, 410 So.2d 487, 490-91 (Fla. 1981).
In fact, courts and commentators uniformly agree that public bargaining is inherently different from private bargaining. For example, in Antry v. Illinois Educational Labor Relations Board, 195 Ill. App.3d 221, 141 Ill.Dec. 945, 552 N.E.2d 313 (1990), the court addressed the necessity of political activities by public union representatives in order to achieve what private sector unions can achieve solely at the bargaining table.
[C]ourts have noted one important difference between collective bargaining in the public sector, as opposed to the private sector, is that in the public sector, it is often necessary for a labor union to, in effect, obtain approval of a proposed contract by a legislative body through appropriation of the funds required to provide the wage and salary increases called for by the contract, in addition to obtaining the assent of the employing governmental agency or department to the terms of the contract.
Id. 141 Ill.Dec. at 975, 552 N.E.2d at 343. See also Daniel P. Sullivan, Public Employee Labor Law § 11.4 (1969) (public sector *418 employees engaging in wage negotiations are in a different position than private employees, because the employer is not the final authority for public employees  the legislature is).
Indeed, the Missouri Supreme Court found the differences between public and private employees to be so overwhelming that it held that the Missouri Constitution's collective bargaining provision[2] did not apply to public employees at all. City of Springfield v. Clouse, 206 S.W.2d 539 (Mo. 1947). Most importantly, the court noted, private employers can be bound by collective bargaining agreements, while legislative discretion cannot be bargained away. Id. at 545. The court decided that the constitutional provision could not apply to public employees because a collective bargaining agreement in this context would amount to no more than an expression of the employees' desires for the lawmaker's consideration and guidance. See also Communications Workers v. Union County Welfare Board, 126 N.J. Super. 517, 315 A.2d 709, 715 (App.Div. 1974) (in interpreting statute implementing constitutional right to collectively bargain, which itself specifically differentiates between public and private employees, court noted "salient differences between public and private employment relations which necessarily affect the characteristics of collective bargaining in the public sector").
The fact that public employee bargaining is protected under Florida's Constitution does not require us to ignore universally recognized distinctions between public and private employees. The constitutional right to bargain must be construed in accordance with all provisions of the constitution. Surely it was not intended to alter fundamental constitutional principles, such as the separation of powers doctrine. Under the Florida Constitution, exclusive control over public funds rest solely with the legislature. Art. VII, § 1(c), Fla. Const. ("No money shall be drawn from the treasury except in pursuance of appropriation made by law."). This fact in and of itself necessitates a realization that public and private bargaining is inherently different.
Unlike the case of a private employer, whose agreement with a union binds the employer to fund its terms, the public employer, deemed by statute to be the governor, cannot so bind the guardian of its funds, the legislature.[3] The legislature and the district courts of appeal have interpreted article I, section 6, in this manner. Thus, section 447.309(2) provides that "[t]he failure of the legislative body to appropriate funds sufficient to fund the collective bargaining agreement shall not constitute, or be evidence of, any unfair labor practice." Further, in Pinellas County Police Benevolent Association v. Hillsborough County Aviation Authority, 347 So.2d 801, 803 (Fla. 2d DCA 1977), the court said:
A public employee's constitutional right to bargain collectively is not and cannot be coextensive with an employee's right to so bargain in the private sector. Certain limitations on the former's right are necessarily involved. For instance, a wage agreement with a public employer is obviously subject to the necessary public funding which, in turn, necessarily involves the powers, duties and discretion vested in those public officials responsible for the budgetary and fiscal processes inherent in government.
(Footnote omitted.) See also United Faculty of Florida v. Board of Regents, 365 So.2d 1073 (Fla. 1st DCA 1979) (legislature not required to fund public employees' collective bargaining agreement).
Any other rule would permit the executive branch of government, by entering into collective bargaining agreements calling for additional appropriations, to invade *419 the legislative branch's exclusive right to appropriate funds. Indeed, to accept such a rule would require this Court to abrogate years of strict adherence to the separation of powers doctrine. See generally Chiles v. Children A, B, C, D, E, & F, 589 So.2d 260 (Fla. 1991) (neither power to appropriate nor power to reduce appropriations can be delegated to executive); State ex rel. Kurz v. Lee, 121 Fla. 360, 384, 163 So. 859, 868 (1935) (requiring legislative appropriation prevents expenditure of public money "without the consent of the public given by their representatives in formal legislative Acts ... [and secures to the legislature] the exclusive power of deciding how, when, and for what purpose the public funds shall be applied in carrying on the government").
This is not to say that the constitutional right to collectively bargain is meaningless for public employees.[4] In those states which do not have such a constitutional right, the right of public employees to even go so far as to organize and sit at a bargaining table with their employers is subject to the whims of the legislature. In Florida, by contrast, the legislature may not restrict the right to bargain. See, e.g., City of Tallahassee, 410 So.2d 487 (invalidating statute prohibiting bargaining over retirement benefits). What the constitutional provision does not and cannot do, however, is give to public employees the same rights as private employees to require the expenditure of funds to implement the negotiated agreement. As is true in most states where public employees bargain, the enforcement of the monetary terms of the agreement is subject to the appropriations power of the legislature. The constitutional right of public employees to collectively bargain does not increase the right as commonly understood, but does guarantee that the right may not be taken away or limited.
Accordingly, the collective bargaining agreements entered into by the unions in this case were subject to the appropriations power of the legislature, as are any agreements entered into by public employees. Indeed, the agreements themselves recognized this.[5] The fact that this contingency differentiates public bargaining from private bargaining does not represent an abridgment of the right to collectively bargain, but rather an inherent limitation due to the nature of public bargaining itself.[6]
We turn now to the issue of the power of the legislature to make the unilateral changes discussed above. Other states have addressed a similar issue in the less complicated context of the legislature's refusing to fund a negotiated benefit, or underfunding *420 that benefit.[7] In those cases where the legislature did not appropriate the amount necessary to implement the negotiated agreements, the vast majority of courts have held that the agreements were subject to this contingency. Arguments that the legislature was somehow bound by the negotiated agreement have been rejected as contrary to the legislature's exclusive control over public funds. See, e.g., District 2A, Transp., Technical, Wrhse., Indus. & Serv. Employees Union v. Government of the Virgin Islands, 794 F.2d 915 (3d Cir.1986) (legislature not required to appropriate funds to honor impasse arbitration award regarding salaries for public employees); Public Employees' Local 71 v. State, 775 P.2d 1062 (Alaska 1989) (rejecting union's challenge to legislative resolution refusing to fund negotiated pay raise; monetary terms of agreement not effective until funds are appropriated by the legislature, at its discretion); Suffolk County v. Labor Relations Comm'n, 15 Mass. App. Ct. 127, 444 N.E.2d 953 (funding by legislature for negotiated raises and bonuses could not be compelled), review denied, 388 Mass. 1103, 447 N.E.2d 670 (1983); Minnesota Educ. Ass'n v. State, 282 N.W.2d 915 (Minn. 1979) (upholding legislative reduction of salary increase from 18% to 14% as part of legislature's final control over appropriations), appeal dismissed, 444 U.S. 1062, 100 S.Ct. 1001, 62 L.Ed.2d 744 (1980). See also Stephen F. Befort, Public Sector Bargaining: Fiscal Crisis and Unilateral Change, 69 Minn. L.Rev. 1221, 1243-45 (1985) (legislative power over appropriations combined with definition of the executive as the employer results in potential for unilateral change of agreements if legislature fails to appropriate all funds necessary to implement a contract; notes that "courts consistently have refused to enforce the financial provisions of state employee agreements in the absence of an express legislative appropriation"). Contra AFSCME/Iowa Council 61 v. State, 484 N.W.2d 390 (Iowa 1992).
The facts of the present case are somewhat unique, in that the legislature did not simply underfund or refuse to fund certain benefits, but rather unilaterally changed them.[8] Accordingly, we must determine whether the proviso language at issue here falls under the exclusive domain of the legislature's appropriations power.[9] In making this determination, we find persuasive the New Jersey case of State v. State Troopers Fraternal Association, 91 N.J. 464, 453 A.2d 176 (1982), a case factually similar to the case at bar. There, the New Jersey Legislature changed a term of a collective bargaining agreement through an appropriations act. The collective bargaining agreement gave the troopers participation in the state's prescription drug program, which at the time provided that the state would pay for drugs, but the employee would pay a deductible of $1.25 *421 per prescription. In its next appropriations act, the legislature allocated funds for the program "based upon a copayment [by employee] of $2.50" per prescription. The court upheld this change, basing its decision on a clause in the contract which provided that all terms were "subject to budgetary and/or legislative limitations or changes."[10]
The court also addressed whether the legislature's exclusive power over appropriations entitled it to make unilateral program changes. The state argued that requiring funding at the $1.25 level would violate the appropriations provision of the constitution, since the legislature chose to fund the program at the $2.50 level only. The court addressed this argument by first noting that the legislature was not bound to fund the program simply because the contract called for it. However, because the legislature did choose to fund the program, and because there was no suggestion that the money appropriated was insufficient to cover the program at the $1.25 level, the court held that enforcing the program at this level would not infringe on the appropriations power. Id. 453 A.2d at 179.
We find this test to be a reasonable accommodation of both the right to collectively bargain and the legislature's exclusive control over the public purse. Where the legislature provides enough money to implement the benefit as negotiated, but attempts to unilaterally change the benefit, the changes will not be upheld, and the negotiated benefit will be enforced.[11] This result would not impede upon the legislature's exclusive power over public funds, because the funds would already be there to enforce the benefit. Where the legislature does not appropriate enough money to fund a negotiated benefit, as it is free to do, then the conditions it imposes on the use of the funds will stand even if contradictory to the negotiated agreement. See United Faculty, 365 So.2d 1073. Any other result would necessarily entail impeding on the right to appropriate, since enforcing the negotiated agreement would necessitate additional funding under this scenario.[12]
For the foregoing reasons, we reverse the district court's decision declaring section 9.3.A(5) of the 1988 Appropriations Act to be unconstitutional, quash the order of the trial court granting summary judgment in favor of the unions, and remand to the trial court for further proceedings consistent with this opinion. There is currently no record evidence on the issue of whether the negotiated benefits could be fully funded by the money already allocated by the legislature. Indeed, the parties cannot even agree on the question of whether the legislature's benefits program actually saved the state money over the cost of funding the benefits as negotiated. Therefore, the trial court must determine whether the legislative appropriation was sufficient to fund the annual and sick leave provisions of the collective bargaining agreement. If it was, these provisions of the collective bargaining agreement must be enforced. If these provisions were underfunded, the legislative determination shall control.
It is so ordered.
OVERTON, McDONALD and HARDING, JJ., concur.
*422 KOGAN, J., dissents with an opinion in which BARKETT, C.J., and SHAW, J., concur.
KOGAN, Justice, dissenting.
It is regrettable that the majority opinion has largely abolished article I, section 6 as that constitutional provision applies to public employees. In doing so, the majority also neglects to note that all of the out-of-state opinions upon which it relies are wholly inapplicable here, because none of these other jurisdictions have a constitutional provision like article I, section 6, which expressly applies to public employees. The majority stretches this precedent to fit the situation before us today. It is simply baffling to interpret our own unique constitutional provision in light of out-of-state precedent that has nothing to do with the distinctive legal issues presented here in Florida.
Nor does the majority explain how its holding today harmonizes with the following precedent from this Court:
We hold that with the exception of the right to strike, public employees have the same rights of collective bargaining as are granted private employees by Section 6.
Dade County Classroom Teachers' Ass'n, Inc. v. Ryan, 225 So.2d 903, 905 (Fla. 1969). If we are going to overrule our own precedent  as obviously is happening here  we at least should do so frankly rather than issuing an opinion that is inconsistent with what has gone before.
And the majority's purported adherence to the principle of separation of powers itself is a curiosity, since it tacitly declares that one constitutional provision[13] overrules another[14] in the context of public-employee negotiations. We might just as reasonably declare that the legislature's lawmaking authority allows it to strip public employees of equal protection or due process rights as a condition of employment. The traditional rule of construction is that all provisions of a constitution should be construed so that they are harmonized and each is given effect. Miami Shores Village v. Cowart, 108 So.2d 468, 471 (Fla. 1958). Here, the majority breaks with all our precedent on constitutional construction and interprets one provision to nullify another.
It is not surprising, then, that the majority reaches an obviously bad result. Footnote 6 of the majority opinion, for example, makes the curious statement that money items in a negotiated "agreement" are subject to unbridled legislative whim whereas non-money items are entitled to the most rigorous test known to constitutional law  the compelling state interest test. As a result, salary and leave provisions can be changed by unilateral legislative decree. Non-money items  for example, whether employees get parking spaces close to, or far away from, the office building  are treated with all the rigors the law reserves for the most heinous forms of discrimination. In simple terms, public employees could sue and win if the parking-space provision is not honored, but they would have no recourse whatsoever if their salaries are unilaterally slashed.
Most people would agree that this priority is precisely backward. In essence, the majority elevates the trivial to a status requiring the most intensive judicial scrutiny, while the most significant concerns of public employees are diminished to a level not even worthy of a court's intervention. Judges thus will be required to chastise the legislature for refusing to honor agreements about choice parking spaces, but must keep their judicial hands off of anything involving money  such as salaries, benefits, and leave.
I also note that footnote 6 of the majority opinion is directly in conflict with our opinion in Hillsborough County Governmental Employees Association, Inc. v. Hillsborough County Aviation Authority, 522 So.2d 358 (Fla. 1988). The Hillsborough case involved a refusal to honor a duly negotiated agreement regarding "personal holidays, funeral leave, and seniority" *423  all items involving the appropriation of money. Id. at 359. In confronting this unilateral refusal to honor the agreement, we provided the following analysis:
The right to bargain collectively is, as a part of the state constitution's declaration of rights, a fundamental right. As such it is subject to official abridgement only upon a showing of a compelling state interest... .
... .
... No such showing has been made here, so this impediment upon a fundamental right cannot be sustained.
Id. at 362-63. There is no possible way of reconciling this statement in Hillsborough with the statements the majority makes throughout this opinion and especially in footnote 6.
Yet even putting aside the majority's puzzling analysis, it is the practical effect of the majority's opinion that most troubles me. In effect, the majority strips all public employees in this state of any meaningful right they previously had to collectively bargain with their employers  a right we soundly reaffirmed in Hillsborough. This sweeping pronouncement imposes a direct and lasting detriment upon Florida's teachers, police, sheriff's employees, all other law enforcement officers, public health workers, emergency workers, local government employees, state workers, and any other persons whose salaries are paid from public funds.
Quite literally, tens of thousands of Floridians who once believed they could bargain meaningfully with their employers[15] now have been stripped of this right. Under the majority's approach, the only "right" public employees now have is to "negotiate"  perhaps for weeks or months  with no hope that the "agreements" they reach will be anything more than suggestions on dollar items. The agency that appropriates salaries and benefits then is entirely free to disregard every dollar item in the "negotiated agreement," as though these items never existed. In sum, collective bargaining for public employees now is simply a waste of time for most purposes.[16] Only for non-money items, such as parking-space assignments, can the agreements be enforced in court  unless of course the parking spaces themselves involve some type of monetary appropriation.
Contrary to the majority's conclusion, I cannot agree that the present case turns on the legislature's power to appropriate funds. Were this the sole issue before us, I would agree with the majority, because the power to appropriate funds rests entirely with the legislature, subject only to certain restrictions imposed directly by the Florida Constitution. Chiles v. Children A, B, C, D, E, & F, 589 So.2d 260 (Fla. 1991).
It is equally clear, however, that even a provision in an appropriations act is subject to judicial review if it allegedly violates a fundamental constitutional right or some other provision of the state Constitution. Department of Education v. Lewis, 416 So.2d 455 (Fla. 1982). Such is the allegation before the Court today. Appellees contend that the legislative action at issue here violates article I, section 6 of the Florida Constitution, and we have directly recognized that this constitutional provision embodies a fundamental right. Hillsborough, 522 So.2d at 362. We also have directly recognized that the compelling state interest test applies to collective bargaining agreements as they affect money items, *424 id. at 362-63, contrary to what the majority says.
The record is clear that the legislative alteration of leave benefits was accomplished without the legislature seeking renewed collective bargaining with the unions either directly or through cooperation with the governor in his role as the state's labor negotiator. The majority's approval of this conduct cannot be squared with the plain meaning of article I, section 6 or the holdings in Hillsborough or Dade County Classroom Teachers' Ass'n.
I would hold that, at the very least, the legislature is bound to ensure that some mechanism exists by which negotiations with public employees are meaningful, such as the submission of a dispute to binding arbitration or renewed good-faith negotiation. If the legislature fails to do so, then it is clear that article I, section 6 empowers the courts to formulate a judicial remedy that renders negotiations meaningful for both parties. We clearly have the power to do this, as we expressly stated in Dade County Classroom Teachers' Ass'n v. Legislature, 269 So.2d 684 (Fla. 1972).
I do not imply, however, that the legislature has bound itself in advance to adhere to the governor's duly negotiated collective bargaining agreement. To this extent, I agree with the state that such a holding would violate the legislative power to appropriate funds for salaries and other expenses of the state, because the legislature cannot delegate its appropriation powers to the executive.[17] Art. III, § 12, Fla. Const. Rather, I would hold that article I, section 6 imposes upon the legislature, at a minimum, a duty to seek renewed negotiations with unions whenever the legislature decides to ignore the governor's negotiated agreement with those unions.[18] Typically, this would be done by the legislature acting in conjunction with the governor in his or her role as negotiator for the state.
To say otherwise would render article I, section 6 meaningless for public employees. In the present case, the governor and the unions labored to produce an agreement; and the legislature then utterly ignored the leave provisions of that agreement. Such conduct rendered the very act of negotiating on these issues meaningless. Yet, article I, section 6 plainly states that all employees have a right to collectively bargain through a union. Art. I, § 6, Fla. Const. I simply cannot conceive that this right was meant to be illusory for public employees, as the majority effectively holds today. The right to bargain must be a meaningful right to bargain with state agents who negotiate in good faith, with a manifest goal of settling differences and reaching reasonable compromises. Id. Otherwise, the right created by article I, section 6 is being unlawfully denied or abridged.
I hasten to note, however, that at least two situations could exist that would justify the legislature in taking limited unilateral action. The first situation is a temporary good-faith failure in the bargaining process, such that negotiations cannot be concluded in time for a sitting legislature to include the resulting agreement in the annual appropriations process. In such a situation, I believe the legislature would not violate article I, section 6 if it unilaterally approved a public employee pay and benefits package, provided the package is a necessary part of the annual budgeting process and evinces good faith, and the legislature simultaneously resolves to continue meaningful negotiations in a reasonable effort to reach an agreement with the *425 unions. If such an agreement later is reached, then the next session of the legislature can enact the package, including any provisions the parties have agreed to make retroactive.
Second, the legislature also has authority to take unilateral action whenever justified by a compelling state interest. Hillsborough, 522 So.2d at 362 (construing art. I, § 6, Fla. Const.). This requires the legislature to demonstrate the existence of a compelling state interest that is being advanced by the least intrusive means available. Id. Contrary to what the majority says, the compelling interest test clearly applies to both money and non-money items, as we directly and expressly held in the Hillsborough case. On this question, the burden of proof rests on the legislature, not on the unions. If this burden cannot be met, the legislature is obligated to continue negotiating either through the governor or on its own or seek some other meaningful remedy, such as binding arbitration.
I do not agree with the state's argument that the legislative actions in this case were rendered permissible by operation of section 447.309(2), Florida Statutes (1987), which declares:
The failure of the legislative body to appropriate funds sufficient to fund the collective bargaining agreement shall not constitute, or be evidence of, any unfair labor practice.
Whether or not the actions here constituted an unfair labor practice under the statute, the legislature clearly violated article I, section 6 of the state Constitution by making a unilateral change in leave policy. The state Constitution is the supreme law of Florida, and it necessarily must prevail over any inconsistent statute.
Similarly, I cannot accept the state's argument that the "savings" clauses in the agreements rendered them subject to subsequent unilateral changes by the legislature. This is tantamount to saying that the unions bargained away their right to bargain  a conclusion I find to be unwarranted on this record. If that is what the savings clauses actually say, then to that extent they are void as against public policy. Art. I, § 6, Fla. Const. A savings clause permissibly might refer to future changes in law over which no party to the agreement (including the legislature) has any control, e.g., changes in federal workplace regulations.[19] However, I would hold that a clause in a contract is void under article I, section 6 to the extent it may be construed as delegating to any single party the authority to unilaterally forego meaningful negotiation with the other parties or to unilaterally nullify any part of the agreement. Id.
And in any event, the legislature obviously has refused to assent to this agreement. Under simple principles of contract law, then, this agreement has never actually flowered into an enforceable contract. Since the contract has failed, the savings clauses have failed as well. The only remaining principle of law applicable in this case is article I, section 6. Thus, even if the savings clauses can be construed as the majority suggests, it is incorrect to say that they now are enforceable against the unions. Majority op. at 419. In effect, the majority holds that the legislature is not bound by its part of this failed agreement, but the unions are bound by theirs even though no contract ever was formed. This is a very curious brand of contract law.
For the reasons expressed here, I would approve the result reached by the district court. Solely as applied to the collective bargaining agreements in question, I would hold that the legislative proviso contained in section 9.3.A(5) of the 1988 general appropriations act violates article I, section 6 of the Florida Constitution and therefore is a nullity.
I respectfully dissent.
BARKETT, C.J., and SHAW, J., concur.
NOTES
[1] Article I, section 6, Florida Constitution, provides:

SECTION 6. Right to work.  The right of persons to work shall not be denied or abridged on account of membership or nonmembership in any labor union or labor organization. The right of employees, by and through a labor organization, to bargain collectively shall not be denied or abridged. Public employees shall not have the right to strike.
[2] That provision provides as follows: "That employees shall have the right to organize and to bargain collectively through representatives of their own choosing." Art. I, § 29, Mo. Const.
[3] Although generally the funding of a collective bargaining agreement is thought of in terms of financing wages, the providing of benefits to public employees, including annual and sick leave benefits, also necessarily requires the expenditure of public funds and therefore implicates the legislature's appropriations power.
[4] We therefore expressly disagree with that portion of City of Springfield v. Clouse, 206 S.W.2d 539 (Mo. 1947), in which the Missouri Supreme Court asserted that public bargaining can be no more than a mere suggestion to the legislature. While this may be somewhat true of those portions of the agreement requiring public funding, to characterize even these provisions as a mere suggestion ignores the practical benefits of the political backing of these provisions by both the governor and the unions themselves. The fact that the governor is bound by the negotiated agreement and is required to include full funding for the agreement in his proposed budget, see section 447.309(2), Florida Statutes (1987), gives significant weight to the effectiveness of collective bargaining for public employees.
[5] Each agreement contained a "Savings Clause," which provided as follows:

If any provision of the Agreement, or the application of such provision, should be rendered or declared invalid, unlawful, or not enforceable, by any court action or by reason of any existing or subsequently enacted legislation ... then such provision shall not be applicable, performed or enforced, but the remaining parts or portions of this Agreement shall remain in full force and effect for the term of this Agreement.
[6] For this reason, we reject the unions' argument that the proviso language in this case must be justified by a compelling state interest. See Hillsborough County Governmental Employees Ass'n v. Hillsborough County Aviation Auth., 522 So.2d 358, 362 (Fla. 1988) (fundamental right to collectively bargain subject to abridgment only upon a showing of a compelling state interest). This holding is inapplicable here, because the exercise of legislative power over appropriations is not an abridgment of the right to bargain, but an inherent limitation. Of course, should the legislatively mandated change fall outside the appropriations power, it would constitute an abridgment of the right to bargain and would therefore be subject to the compelling state interest test.
[7] Had that been the case here, then section 447.309(2) would apply, requiring the governor to administer the collective bargaining agreement on the basis of the amount appropriated.
[8] The unions contend that the legislature should have provided for the governor and the unions to return to the bargaining table to negotiate possible changes in annual and sick leave, rather than unilaterally imposing these changes. While such a solution would certainly be preferable to unilateral changes, we refuse to impose renegotiation on our own prerogative. Although some courts have ordered renewed negotiations after a legislature fails to fund a provision, this remedy has only been imposed where the legislature itself mandated it. See Suffolk County, 444 N.E.2d 953 (statute mandates return to parties for further bargaining where legislature denies request for appropriations); Public Employees' Local 71, 775 P.2d 1062 (legislature's resolution directed parties to renegotiate monetary terms after funding was rejected). Accordingly, such a solution would be completely without precedent as a judicially-imposed remedy, in addition to being administratively untenable. We are unwilling to eliminate the certainty of appropriations by requiring renegotiation and then a subsequent reconvening of the legislature to pass a new appropriation every time the legislature attaches conditions to appropriations that happen to touch upon a collective bargaining term.
[9] As an alternative argument, the unions contend that this proviso language deals with subjects other than appropriations and is therefore unconstitutional under article III, section 12 of the Florida Constitution. See Brown v. Firestone, 382 So.2d 654, 663-64 (Fla. 1980). We reject this argument. The proviso language here "directly and rationally relates" to the appropriation.
[10] The state argues that the Savings Clauses found in the present contracts likewise subject the unions to subsequent alterations of terms by the legislature. To the extent that the legislative alterations fall under the appropriations power, this argument is essentially correct  not because the Savings Clauses limit the binding nature of the contract, but because the inherent nature of public bargaining itself so limits it. However, to the extent these Savings Clauses could be construed as general provisions bargaining away the right to bargain, they are void under the Florida Constitution.
[11] Of course, should the legislature be able to show a compelling state interest justifying the abridgment of the right to collectively bargain, its unilateral changes would be enforced.
[12] We do not pass on whether the legislature could subsequently reduce an appropriation which it had previously enacted to fund a collective bargaining agreement.
[13] Art. II, § 3, Fla. Const. (separation of powers).
[14] Art. I, § 6, Fla. Const. (right-to-bargain).
[15] We expressly recognized a right to meaningful negotiation in the Hillsborough case.
[16] The majority is being disingenuous when it suggests, majority op. at 419 n. 4, that the bargained-for agreement is something more than a suggestion to the legislature. Under Florida's weak governor system, the legislature almost uniformly ignores the governor's budget proposals in major respects. Inclusion of the bargained-for agreement in the governor's proposed budget thus is in fact nothing more than a suggestion under the approach taken by the majority. Indeed, the facts of the present case entirely undermine what the majority suggests, since the legislature obviously gave very little if any consideration to the governor's agreement. The majority may be disagreeing in word with City of Springfield v. Clouse, 206 S.W.2d 539 (Mo. 1947), but it is not disagreeing with that opinion in effect.
[17] For this reason, any collective bargaining agreement reached by the governor necessarily is tentative and contingent upon future legislative approval to the extent that the agreement calls for the appropriation of state funds, see art. III, § 12, Fla. Const., and all parties necessarily are on notice of same. Any other conclusion would violate the doctrine of separation of powers. Art. II, § 3, Fla. Const. There thus is no impairment of the obligation of contracts if the legislature rejects the agreement, see art. I, § 10, Fla. Const., because no contract exists with regard to salary and benefits provisions until the legislature assents to them. However, the impairment of contracts issue is wholly separate from the right-to-bargain issue under article I, section 6.
[18] Accordingly, I would disapprove United Faculty v. Board of Regents, 365 So.2d 1073 (Fla. 1st DCA 1979), to the extent it conflicts with this opinion.
[19] I believe this was the actual intent underlying the savings clauses  not to allow the legislature to unilaterally ignore the negotiated agreement.